UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| DARIUS H. JAMES, CHARLES KAISER, and MARY PILON individually and on behalf of similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> CEREBRAS SYSTEMS INC., a Delaware corporation, <br><br> Defendant. | Case No. 4:25-cv-09361-AMO <br><br> [~~PROPOSED~~] **STIPULATION AND ORDER REGARDING THE PRODUCTION OF ELECTRONICALLY STORED INFORMATION ("ESI") AND HARD COPY DOCUMENTS** |

After conferring on these matters, the Parties propose to the Court the following stipulated order ("Order") for production of electronically stored information and paper discovery. Pursuant to this Court's Civil Standing Order, the Parties state that this Discovery Order is based in part on the United States District Court for the Northern District of California's model discovery order titled "[Model] Stipulated Order Re: Discovery of Electronically Stored Information For Standard Litigation." A declaration explaining the Parties' modifications to the model order is attached hereto as Exhibit 1. A redline comparing the Parties' proposed Order to the model is attached hereto as Exhibit 2.

I.     **DEFINITIONS**

A.     "Litigation" or "Action" refers to the case captioned above.

6246060.v1

**B.** "Electronically Stored Information" or "ESI" means information that is stored electronically, regardless of the media or whether it is in the original format in which it was created, as opposed to stored in hard copy (i.e., on paper). ESI carries the broadest possible meaning consistent with Fed. R. Civ. P. 34(a) and Fed. R. Evid. 1001.

**C.** "Document(s)" carries its broadest meaning consistent with Fed. R. Civ. P. 34 and includes both ESI and paper documents.

**D.** "Metadata" means i) information embedded in a Native File that is not ordinarily viewable or printable from the application that generated, edited, or modified such Native File, or ii) information generated automatically by the operation of a computer or other information technology system when a native file is created, modified, transmitted, deleted or otherwise manipulated by a user of such system. Metadata is a subset of ESI.

**E.** "Party" or "Parties" means Plaintiffs Darius H. James, Charles Kaiser, and Mary Pilon ("Plaintiffs") and Defendant Cerebras Systems Inc.

**F.** "Responding Party" means a Party that produces Documents, including non-parties.

**G.** "Requesting Party" means a Party to whom Documents are produced. The named Plaintiffs collectively will be considered a single "Requesting Party" when serving production requests on Cerebras as the Responding Party.

## II.   PURPOSE

This Stipulation and Order ("Order") regarding the production of Electronically Stored Information ("ESI") and Hard Copy Documents (collectively, "Document" or "Documents") shall govern discovery of Documents in this case as a supplement to the Federal Rules of Civil Procedure, this District's Guidelines for the Discovery of ESI ("ESI Guidelines") and Checklist for Rule 26(f) Meet and Confer Regarding ESI ("ESI Checklist"), and any other applicable orders and rules. Nothing in this Order is intended to expand or limit the scope of discoverable information or the Parties' obligations under the Federal Rules of Civil Procedure. Any disputes arising out of the production of Documents subject to this Order shall be resolved according to Federal Rules of Civil Procedure, Local Rule 26, and the Court's Standing Orders.

The Parties acknowledge that the production of source code is not covered by this ESI Order. The Parties shall negotiate a separate protocol and supplemental order to govern the inspection and production of

source code.

## III.   <u>COOPERATION</u>

The Parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith throughout the matter consistent with this Court's Guidelines for the Discovery of ESI.

## IV.   <u>LIAISON</u>

The Parties shall identify liaisons to each other who are and will be knowledgeable about and responsible for discussing their respective ESI. Each e-discovery liaison will be, or have access to those who are, knowledgeable about the technical aspects of e-discovery, including the location, nature, accessibility, format, collection, search methodologies, and production of ESI in this matter. The Parties will rely on the liaisons, as needed, to confer about ESI and to help resolve disputes without court intervention.

## V.   <u>PRESERVATION OF ESI</u>

**A.      Preservation Obligations:**  The Parties will take reasonable and proportionate steps to preserve ESI that is within their respective possession, custody, or control and may be subject to discovery pursuant to FRCP 26(b)(1). By preserving information for the purposes of this Litigation, the Parties are not conceding that such material is discoverable. The Parties agree to exchange a list of the types of ESI they believe should be preserved, including the (i) relevant custodial and non-custodial data sources, and (ii) the custodians (including their job title(s) and employment dates) or general job titles or descriptions of custodians for whom they believe ESI should be preserved, e.g., "HR head," "scientist," and "marketing manager." The Parties shall have a continuing obligation to take reasonable and proportional steps to identify and preserve custodial and non-custodial data sources or custodians as reasonably necessary.

**B. ESI Not Reasonably Accessible:**  If a Responding Party is aware of inaccessible data that is likely to contain unique, discoverable ESI, it will identify the source from which it claims the data is not reasonably accessible.

The two data sources listed below will be retained pursuant to standard business processes and will not be searched, reviewed, or produced, unless ordered by the Court or agreed to by the parties:

   i.  Backup systems and/or tapes used for disaster recovery; and

   ii.  Systems no longer in use that cannot be accessed by using systems currently in use by the party.

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-09361-AMO

In addition to the above, examples of data the Parties agree not to preserve are:

    a.    Deleted, "slack," fragmented, or unallocated data only accessible by forensics;

    b.    Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system;

    c.    Structural files not material to individual file contents (e.g. .CSS, .XSL, .XML, .DTD, etc.); and

    d.    Data from platforms that do not offer preservation functionality nor allow for the creation of account-wide snapshots or backups.

Data that is inaccessible within the meaning of Federal Rule of Civil Procedure 26(b)(2)(B) shall not be produced to another party, either in native form or otherwise, unless ordered by the Court. The Parties will meet and confer in good faith regarding whether there are reasonable and practical methodologies to query or sample such data sources. The Parties acknowledge that preservation of Documents does not prohibit their continued use in the ordinary course of business. Accordingly, certain metadata fields—including, but not limited to, last-accessed and last-modified dates—may change between the date of preservation and the date of collection as a result of continued ordinary-course use or routine system operations. The Responding Party's obligation is to produce metadata as it exists at the time of collection, and no adverse inference shall arise solely from the fact that a Document's metadata reflects activity occurring after the date preservation was initiated.

## VI.   <u>IDENTIFICATION OF ESI</u>

1.    The Parties agree that within 14 days following receipt of the Requesting Party's requests for production of Documents and, for Plaintiffs' First and Second Sets of Requests for Production and Cerebras's First Set of Requests for Production, within 14 days of the Court entering this Protocol, or a later time if agreed to by the Parties, the Responding Party shall disclose:

    a.    The names of individuals from which the Responding Party plans to collect Documents in response to the document requests. The custodians shall be identified by name, job title(s), and employment dates.

    b.    The locations and descriptions of custodial and non-custodial data sources from which the Responding Party plans to collect Documents in response to the document

requests. The locations and descriptions of any third-party data sources likely to contain relevant or responsive information (e.g. third-party email and/or mobile device providers, "cloud" storage, etc.) and, for each such source, the extent to which a Party is (or is not) able to preserve information stored in the third-party data source.

2. If, following this disclosure, a Requesting Party identifies additional document custodians that possess non-cumulative, unique documents or information that would justify enlarging the list of custodians, the Parties shall meet and confer in good faith to determine whether such custodians should be added. If the Parties are unable to reach agreement within 21 days of the Requesting Party's request, then the Requesting Party may raise any remaining disagreement to the Court. Nothing in this paragraph waives any objection by a Responding Party that further investigation, discovery or document production is needed before determining the necessity or lack thereof of additional custodians.

3. Furthermore, following the disclosure laid out in Section VI.1., the Requesting Party may request to meet and confer in an effort to agree upon the following: (1) custodians from whom information will be collected or produced, subject to the procedure and standard laid out in Section VI.2; (2) data sources, including custodial, non-custodial, and third-party sources, which will be collected or produced; (3) the identity and scope of sources of Documents and ESI to be produced without the use of technology-assisted review or search terms; (4) applicable timeframe for collection and review of Documents; and (5) prioritization of categories of Documents and ESI to be collected, reviewed, and produced.

## VII.    SEARCH & REVIEW

1. The Parties agree that each Responding Party is best situated to determine the most appropriate method or methods for that Responding Party to search, collect, cull, and produce documents responsive to discovery, consistent with Sedona Conference Principle 6 which instructs that "[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information." Nothing in this ESI Protocol alters a Responding Party's obligation to conduct a reasonable inquiry or use a reasonable process in searching for and producing relevant information, nor does it alter a Requesting Party's right to challenge a deficient production.

2. The Parties will meet and confer to discuss the use of search terms, filters and date ranges or

the use of advanced search and retrieval technologies. Within a reasonable time period, Responding Party shall specify the technique or techniques (e.g., search terms, technology assisted review ("TAR"), artificial intelligence or machine-learning technology (collectively, "AI")) it will use to search for and cull material it reasonably anticipates will be responsive to Requests for Production. If the Requesting Party objects to the particular technique or techniques, the Parties will timely meet and confer regarding the matter and submit any unresolved disputes to the Court for resolution.

3.      A Party who intends to use search terms will describe a Search Protocol that will include: (a) the criteria to be used to identify the universe of Documents to which search terms will be applied (e.g., date range), and (b) proposed search terms to be applied to that universe of Documents, subject to revision based on, for example, meet and confer of the Parties and the number of hits returned by each term. A Requesting Party may also suggest search terms to be applied. Each Requesting Party shall limit its ESI production requests to a total of twenty search terms per custodian per party, for the avoidance of doubt a custodian can include either Party itself for searches of Party-wide electronic repositories. The Parties may jointly agree to modify this limit without the Court's leave. The Court shall consider contested requests for additional search terms per custodian, upon showing a distinct need based on the size, complexity, and issues of this specific case. The search terms shall be narrowly tailored to particular issues. Indiscriminate terms, such as the producing company's name or its product name, are inappropriate unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction. The Parties acknowledge that "indiscriminate terms" would not include names of various publicly available training datasets such as, "Books3." A conjunctive combination of multiple words or phrases (e.g., "computer" and "system") narrows the search and shall count as a single search term. A disjunctive combination of multiple words or phrases (e.g., "computer" or "system") broadens the search, and thus each word or phrase shall count as a separate search term unless they are variants of the same word or identify alternative names, examples, or members of the same discrete set of datasets, websites, or repositories. Use of narrowing search criteria (e.g., "and," "but not," "w/x") is encouraged to limit the production.

4.      Any Search Protocol will include a requirement for the Responding Party to provide hit reports for proposed search terms prior to utilizing the search terms to narrow the universe of Documents to be reviewed. Search term hit reports will include, for each term, the number of documents with one or more

search term hits, that number plus any attachments to those documents, and the number of documents hitting uniquely on that term and not on any other term in the same list. The report will also include total number of documents hitting on one or more terms and that number plus any attachments to those documents (presumptive review population). Any Search Protocol shall include a requirement to review one random statistical sample of distinct Documents, determined by a sampling of a confidence level of 95% and a margin of error of 2%, that do not hit on the search terms that are agreed upon by the Parties (the "Null Set"). The Null Set of distinct Documents shall be generated after all document processing is substantially complete. These Null Set Documents should come from each custodian and include Documents throughout the entire date range. The Responding Party should then review the Null Set Documents and include in future productions any responsive Documents located therein. If more than 10% of the Null Set are responsive, then the Parties shall revisit the agreed-upon search terms by analyzing the Documents produced and determining which additional terms are necessary. The Parties agree to meet and confer regarding the Search Protocol and to raise any disputes regarding the Search Protocol for resolution by the Court.

5.      Nothing in this order or any other document relating to discovery in this matter shall be construed or interpreted as precluding a Responding Party from performing a responsiveness review to determine if documents captured by search terms are in fact responsive to the requesting party's request. Further, nothing in this order or any other document relating to discovery in this matter shall be construed or interpreted as requiring the production of all documents captured by any search term if that document is – in good faith - deemed not responsive to the requesting party's request for production by the Responding Party.

6.      If a Responding Party elects to use search terms in combination with TAR on the same set of Documents ("layering"), it shall disclose that intent to the Requesting Party before doing so, and the Parties shall meet and confer on a protocol governing the use of layering. The protocol shall include a method to compare the number of hits when there is and is not layering for the set of Documents at issue, and permit the Requesting Party to make a reasonable request that the Responding Party review a reasonable sample of Documents excluded from review through the layering process to assess whether responsive Documents have been excluded. In the event that the Parties cannot reach an agreement on a protocol after meeting and

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-09361-AMO

conferring, the Parties shall submit competing protocols to the Court.

7. A Party who intends to use TAR to reduce the population of documents to be reviewed shall disclose a TAR Protocol that includes, at a minimum, the information listed in Appendix 3.

8. A Responding Party that elects to use AI to assist in responsiveness or privilege determinations ("AI Responsiveness Review") shall disclose that election to the Requesting Party. AI Responsiveness Review constitutes workflows utilizing large-language models (LLMs), deep-learning classifiers, embedding-based similarity analysis, semantic clustering, predictive redaction systems, or generative summarization models used to determine whether a Document will be produced, withheld, or redacted.

9. The Responding Party shall provide an AI Review Protocol, which shall include, at a minimum, the information listed in Appendix 4.

Nothing in this Section shall be construed to diminish the Responding Party's obligations under the Federal Rules of Civil Procedure, this Order, or applicable law. Legal counsel remains responsible for ensuring the accuracy and completeness of all productions.

Documents or ESI known to be responsive to a discovery request or relevant to the subject matter of this action shall be produced without regard to whether it was responsive to any search methodology described herein or developed in accordance with this Order, unless Counsel specifically identifies the documents being withheld and provides a specific objection for withholding each withheld document.

Documents which are reasonably believed to be responsive and for which text-based search technologies are fundamentally ineffective, such as images, video, certain spreadsheets, certain hard copy documents, certain documents from noncustodial sources, or certain foreign language documents where the Parties do not have suitable search terms in such language, must be reviewed without culling by search terms, predictive coding, or other technologies that rely primarily on text within the document. Prior to the production of such unsearchable items, the Responding Party may conduct a page-by-page review for responsiveness, confidentiality, privilege, and other protections.

## VIII.  PRODUCTION FORMATS

The Parties agree to produce Documents in the formats set forth in Appendix 1 and 2 hereto.

## IX.    __PRIVILEGED DOCUMENTS AND PRIVILEGE LOG__

To the extent that a Party reasonably determines that one or more responsive Documents or a portion of a Document needs to be redacted because it is subject to the attorney-client communication privilege or work product doctrine, or otherwise not discoverable on the basis of a recognized protection or privilege (collectively, the "Privileges" and each a "Privilege"), the Party shall, within 45 days of the production from which Documents are withheld or redacted for privilege, produce a log in Excel format listing each Document withheld or redacted for privilege from that production separately that sets forth:

(a) the nature of the privilege(s) or other protection claimed;

(b) the date of the Document;

(c) the identity of all persons who sent, authored, signed or otherwise prepared the document (including an ESQ or other notation to identify all attorneys, and information as to whether such attorney is in-house counsel);

(d) the identity of all persons designated as addressees or copyees, including blind copyees (including an ESQ or other notation to identify all attorneys and information as to whether such attorney is in-house counsel);

(e) a description of the general subject matter contained in the Document and the type of Document (e.g., letter, memorandum, handwritten notes) sufficient to allow the Requesting Party to assess the claimed Privilege and/or to allow the Court to rule upon the applicability of the claimed protection;

(f) the nature of the privilege asserted (e.g., AC, WP, AC/WP);

(g) A member of the Responding Party's litigation team shall review each document included on the log;

(h) Each member of a family (i.e., e-mail attaching memorandum) that is withheld in full for privilege shall be identified on the log separately, unless the description for the parent document provides information sufficient to identify the attachments and understand why they are being withheld;

(i) Each document redacted for privilege shall be identified on the log separately; and

(j) For redacted Documents with multiple redactions, one log entry can be used to describe the multiple redactions, so long as a single entry is sufficient to adequately identify the basis for all redactions, as described in this paragraph.

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-09361-AMO

Provided that they contain Privileged Material and that there has been no known waiver of privilege, the following materials presumptively need not be logged:

a.      Communications regarding this Action exclusively within a law firm, or exclusively between or among law firms serving as a Party's outside counsel, as well as their employees and support staff;

b.      Attorney work product regarding this Action created by a Party's outside counsel, including their respective employees and support staff;

c.      Communications regarding this Action between and among a Party's outside counsel and their Experts or Professional Vendors, and attorney work product created by Experts or Professional Vendors;

d.      Communications regarding this Action between or among a Party and its outside counsel; and

e.      Communications between or among a Party and its outside counsel after October 30, 2025 (the date the Complaint was filed).

The phrase "regarding this Action" means communications or work product that directly relates to the activities of this Action or preparation of counsel in relation to this Action. If the communication relates to the subject matter of this Action (e.g., the actionable conduct alleged to be harmful by the Plaintiffs) separate and apart from the activities of this Action, then the communication is not "regarding this Action."

## X.      INADVERTENT PRODUCTION OF PRIVILEGED MATERIAL

Pursuant to Federal Rule of Evidence 502(d) and (e), the production of a privileged or work-product-protected document is not a waiver of privilege or protection from discovery in this case or in any other federal or state proceeding. For example, the mere production of privileged or work-product-protected documents in this case as part of a mass production is not itself a waiver in this case or any other federal or state proceeding. A party or non-party that asserts that it inadvertently produced privileged or protected documents shall not be required to provide discovery on its internal procedures for conducting privilege reviews prior to production, and it shall not be required to demonstrate that such procedures were sufficiently rigorous.

## XI.   MISCELLANEOUS PROVISIONS

### A.   Objections Preserved.

Nothing in this Order shall be interpreted to require disclosure of relevant information protected by the attorney-client privilege, attorney work-product doctrine, or any other applicable privilege or immunity. Except as provided expressly herein, the Parties do not waive any objections as to the production, discoverability, authenticity, admissibility, or confidentiality of Documents and ESI.

### B.   Technical Variances.

Recognizing that each Responding Party may experience production issues due to data systems or files that may not be fully compatible with the technical specifications set forth herein, any practice or procedure set forth herein may be varied by agreement of the Parties, confirmed in writing, to accommodate such issues and/or where such variance is deemed appropriate to facilitate the timely and economical production of Documents or ESI. No Party shall unreasonably object to any such variance.

### C.   Hard Copy Document Storage.

During the pendency of this litigation, the Parties shall make reasonable efforts to preserve the originals of all hard copy Documents as to which there may be issues of legibility of all or any part of the production copy. Each Party reserves the right to request to inspect such original Documents of the opposing Party or Parties, which request shall not be unreasonably denied. If such request to inspect is denied, the Party may seek relief from the Court.

### D.   Short Message Data.

Electronic messages exchanged between users on communication software such as Microsoft Teams and Slack shall be produced in a searchable format that preserves the conversational relationship and presentational features of the original messages, such as emojis, images, video files, and animations. Electronic messages must not be converted to unitized files that contain less than a 24-hour period of conversation. Redactions may be applied to privileged portions of a conversation. To the extent electronic messages cannot be produced in a reasonably useable format, the Parties will meet and confer to address the identification, production, and production format of short-message data.

### E.   Pointer Hyperlinks.

Hyperlinked documents shall not be deemed part of a document family for purposes of attachment

production. The Requesting Party may request the production of the current versions of up to one hundred (100) non-public, responsive, and non-privileged documents and communications that are within the Responding Party's possession, custody, or control and are hyperlinked within the Responding Party's production by providing to the Responding Party a list of hyperlinks and corresponding Bates numbers. The Responding Party shall produce the version of the requested hyperlinked document that exists as of the date of collection, or state its basis for withholding the same, no later than fourteen (14) days following receipt of the Requesting Party's request. The parties agree that the current version of the hyperlinked document may differ from the version of the document at the time the hyperlink was sent, but if possible the Responding Party will produce the version of the document as it existed at the time the hyperlink was sent. The parties agree to meet and confer in good faith to resolve any disputes concerning the appropriateness of production of the requested documents and communications and any reasonable request to increase the cap on the total number of hyperlinked documents and communications to be produced.

**F.    No Email Thread Suppression.**

No email may be withheld from production because it is included in whole or in part in a more inclusive email, although Parties may use email threading for their own internal review and other internal processes.

**G.    Collaboration Tools.**

The parties agree to produce the latest in time version of documents stored on a collaboration or document management tool. To the extent the Requesting Party reasonably requests to receive previous versions of documents, if any, the Requesting Party will identify the document(s) with specificity and the parties will engage in a meet and confer process relating to the same. For documents produced from collaboration or document management tools, the Responding Party shall preserve and, upon a reasonable request, produce version history or audit log metadata sufficient to identify the date, author, and general nature of substantive revisions to the document.

**H.    Non-Party Documents.**

A Party that issues a Non-Party subpoena ("Issuing Party") shall include a copy of this Order with the subpoena and state that (1) the subpoenaed Non-Party should produce Documents in response to the subpoena to all Parties; and (2) the Parties to this Litigation have requested that Non-Parties produce

Documents in accordance with the specifications set forth herein. If a subpoenaed Non-Party produces Documents to the Issuing Party but does not produce those Documents to other Parties, the Issuing Party shall produce such Documents to those other Parties within 14 days of receiving the Documents, except that any Party may request production on an expedited basis for good cause. Nothing in this Order is intended or may be interpreted to narrow, expand, or otherwise affect the rights of the Parties or Third Parties to object to a subpoena. If a Non-Party production is not Bates-stamped, the Issuing Party will affix the documents with unique Bates Numbers.

**I.      Lost, Destroyed, or Irretrievable ESI.**

If a Responding Party learns that responsive ESI that once existed was lost, destroyed, or is no longer retrievable as a result of acts or circumstances not occurring in the ordinary course of business, the Responding Party shall explain where and when the responsive ESI was last retrievable in its original format and shall disclose the circumstances surrounding the change in status of that responsive ESI, whether that information is available from other sources, whether any backup or copy of such original responsive ESI exists.

**XII. MODIFICATION**

This Order may be modified by a stipulation of the Parties or by the Court for good cause shown.

**IT IS SO STIPULATED**, through Counsel of Record.

DATED: June 29, 2026

*/s/ Sean A. Petterson*
**McGuire Law, P.C.**
Eugene Y. Turin (SB # 342413)
1089 Willowcreek Road, Suite 200
San Diego, CA 92131
Tel: (312) 893-7002 Ex. 3
Fax: 312-275-7895
Email: eturin@mcgpc.com

David L. Gerbie (pro hac vice)
Jordan R. Frysinger (pro hac vice)
Donald S. Cuba II (pro hac vice)
Brendan J. Duffner (pro hac vice)
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
Email: dgerbie@mcgpc.com

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-09361-AMO

Email: jfrysinger@mcgpc.com
Email: dcuba@mcgpc.com
Email: bduffner@mcgpc.com

**Lieff Cabraser Heimann & Bernstein LLP**
Daniel M. Hutchinson (SB # 239548)
Anne B. Shaver (SB # 255928)
Amelia H. Haselkorn (SB # 339633)
Alison C. Fraerman (SB # 351981)
275 Battery St., 29th Floor
San Francisco, CA 94111
Tel: (415) 956-1000
Email: dhutchinson@lchb.com
Email: ashaver@lchb.com
Email: ahaselkorn@lchb.com
Email: afraerman@lchb.com

Rachel J. Geman (pro hac vice)
Sean A. Petterson (pro hac vice)
250 Hudson St., 8th Floor
New York, NY 10013
Tel: (212) 355-9500
Email: rgeman@lchb.com
Email: spetterson@lchb.com

*Counsel for Plaintiffs and the Putative Class Members*

DATED: June 29, 2026

*/s/ Eric K. Phung*
**Keker, Van Nest & Peters LLP**
Robert A. Van Nest (SB # 84065)
Sophie Hood (SB #295881)
Christopher S. Sun (SB #308945)
Christina Lee (SB #314339)
Eric K. Phung (SB #346625)
Celina S. Malave (SB #347808)
Lisa C. Lu (SB #364259)
633 Battery Street
San Francisco, CA 94111
Tel: (415) 391-5400
Fax: (415) 397-7188
Email: rvannest@keker.com
Email: shood@keker.com
Email: csun@keker.com
Email: clee@keker.com
Email: ephung@keker.com
Email: cmalave@keker.com
Email: llu@keker.com
*Counsel for Defendant Cerebras Systems Inc.*

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-09361-AMO

**IT IS ORDERED** that the foregoing Agreement is approved.

DATED: July 7, 2026

_____

Hon. Robert M. Illman
United States Magistrate Judge

**APPENDIX 1**
**PRODUCTION DELIVERY REQUIREMENTS**

**I.   GENERAL PRODUCTION PROVISIONS**

The Parties have agreed that ESI should be produced as TIFF images and in Native Format where applicable with accompanying data and image load files.

**A.   Production Components.**

Except as otherwise provided below, ESI must be produced in accordance with the following specifications:

a)   an ASCII delimited data file (.DAT) using standard delimiters;

b)   an image load file (.OPT) that can be loaded into commercially acceptable production software (e.g. Concordance);

c)   single page black-and-white TIFF or color JPEG images, or native files with single page placeholder TIFF images, depending on the applicable production format for each type of file;

d)   and document level .TXT files for all documents containing extracted full text where available or OCR text where extracted text is not available or where the document has been produced with redactions in a format other than native.

e)   Family relationships (be that email, messaging applications, or otherwise) will be maintained in production. Attachments should be consecutively produced with their parent. Chats from programs like Slack and HipChat should be produced in families by channel or private message. Artifacts of processing – files that would not exist but for being processed in eDiscovery processing software – are not considered true attachments and can be withheld from production regardless of familial relationship (examples include images from email footers, ATT######.html files that contain no content, and Microsoft Office files with generic names such as "Microsoft Excel Spreadsheet 1.xlsx").  If, however, the Requesting Party reasonably believes that an embedded object, document, or file—such as an OLE embedded object (e.g., an embedded Microsoft Office file) or an image embedded in an RTF file—is responsive, the Requesting Party may request that the item be extracted and produced

- 1 -

as a separate file associated with the parent document. The Responding Party shall produce such embedded item upon a reasonable request.

f) If a particular document warrants a different production format, the Parties will cooperate in good faith to arrange for a mutually acceptable production format.

**B.**     **Production Media and Access Controls.**

Productions must be encrypted and produced through secure electronic means, such as secure file sharing methods (e.g. FTP), or on CD, DVD, flash drive or external hard drive ("Production Media"). Nothing in this ESI Order will preclude or impair any and all protections provided the Parties by any Protective Order(s) agreed and entered into by the Parties. Parties will use best efforts to avoid the unnecessary copying or transmittal of produced documents. If questions arise, the Parties will meet and confer to ensure security concerns are addressed prior to the exchange of any documents.

**C.**     **Data Load Files/Image Load Files.**

Each TIFF in a production must be referenced in the corresponding image load file. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the image load file(s) in the production. The total number of pages referenced in a production's image load file should match the total number of TIFF files in the production. The total number of documents in a production should match the total number of records in the data load file. Load files must not vary in format or structure within a production, or from one production to another except by agreement of the Parties.

**D.**     **Metadata fields.**

The Parties shall use reasonable methods of collection and processing that preserve the integrity of reasonably accessible metadata and ordinary parent-child relationships, such as the association between emails and their attachments or between embedded documents and their parent documents. The metadata fields identified in Appendix 2 shall be produced to the extent reasonably accessible and available through standard processing methods. A Responding Party shall not be required to create metadata that does not otherwise exist or that is not reasonably obtainable through ordinary processing. Privileged metadata may be redacted and logged where appropriate.

- 2 -

**E.      TIFFs.**

Unless excepted below, single page, black and white, Group IV TIFFs should be provided, at least 300 dots per inch (dpi) for all documents. If the Requesting Party is not satisfied with the quality of TIFFs for particular images, it may request the Responding Party to produce those images in color JPEGs or native format. In addition, the Parties shall take reasonable efforts to process word processing documents (e.g., MS Word) with track changes and/or comments unhidden on the TIFF image.

**F.      Text Files.**

Each Document produced under this Order shall be accompanied by a Document level text file containing all of the text for that Document, not one text file per page. Each text file shall be named to use the Bates number of the first page of the corresponding Document. The text files shall be generated by extracted text from native files OCR text files from hard copy scanned Documents. To ensure optimal accuracy and quality, OCR software used for extracting text from native files and for processing hard copy scanned Documents shall be set to the highest quality setting and shall include functionality to automatically deskew and autorotate images to ensure proper text orientation and alignment. The .DAT load file shall include a link to the corresponding text file.

**G.      OCR Text File.**

The Parties will provide searchable OCR text of any paper or other Documents from which ESI Processing could not extract text.

**H.      Extracted Text Files from ESI.**

The Parties shall extract the text of each ESI item directly from the ESI native file, where extracted text is reasonably available. For contacts and calendars collected and/or processed after the execution date of this Order, fields should be extracted and produced as text.

**I.      OCR Text for Redacted Documents.**

The Parties will provide searchable OCR text for any files that have been redacted in TIFF format prior to production.

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-009361-AMO

**J.    Bates Numbering.**

1.    Each TIFF image produced under this Order should be assigned a Bates number that must: (1) be unique across the entire document production; (2) maintain a constant length of eight numeric digits (including 0-padding) across the entire production; and (3) be sequential within a given Document.

2.    The Responding Party will brand all TIFF images in the lower right-hand corner with its corresponding Bates number, using a consistent font type and size. If the Requesting Party believes that a Bates number obscures the content of a Document, then the Requesting Party may request that the Document be produced with the Bates number in a different position.

**K.    Production Log.**

With each production of documents, the Responding Party shall provide the following information: (i) Production volume number; (ii) Date of the production; (iii) Bates range for the production; (iv) Other relevant information about the production (i.e., whether the production is an overlay file for a previous production).

**L.    Re-Production of Prior or Other Litigation Documents.**

Where a Requesting Party seeks re-production of a set of Documents produced in a prior litigation or any other proceeding, or where a prior production of Documents or ESI by a Party in a prior litigation or any other proceeding is the only reasonably accessible source of those Documents or ESI to be produced by a Party in this litigation, the Responding Party may re-produce such Documents in the manner in which they were produced in the prior case, including all objective coding or metadata fields required by this protocol to the extent reasonably available to the Responding Party as part of the productions set.  For any such re-production in accordance with this Paragraph, the Responding Party is not obligated to re-format the prior production in accordance with the production specifications in ESI stipulation, but must provide Bates numbering and confidentiality designations specific to this litigation.

**M.    Time Zone.**

All provided metadata pertaining to dates and times will be standardized to PT.

**N.    Confidentiality Designations.**

If a particular Document has a confidentiality designation, the designation shall be stamped on the face of all TIFF images pertaining to such Document, in the lower left-hand corner of the Document, or as

- 4 -

close thereto as possible while preserving the underlying image. If the Requesting Party believes that a confidentiality designation obscures the content of a Document, then the Requesting Party may request that the Document be produced with the confidentiality designation in a different position. No Party may attach to any filing or any correspondence addressed to the Court (including any Magistrate Judge), or any adverse or third Party, or submit as an exhibit at a deposition or any other judicial proceeding, a copy (whether electronic or otherwise) of any native format Document produced by any Party without ensuring that the corresponding Bates number and confidentiality legend, as designated by the Responding Party, appears on the Document. For each Document that is marked confidential, a Confidentiality field will be populated with the word "Confidential" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" in the .dat file. Also, any Documents marked Confidential must be handled in accordance with the Protective Order entered in this case.

## II.    PRODUCTION OF "ESI"

### A.    De-NISTING and System Files.

ESI productions shall be de-NISTed using the industry standard list of such files maintained in the National Software Reference Library by the National Institute of Standards & Technology. De-NISTED files need not be produced. The Parties may mutually agree upon any additional file types that can be excluded from review and production. A Responding Party shall identify any additional standard, readable, and reviewable file types which have been excluded from its document review population for any production made following the date of this Order, and will utilize reasonable best efforts to do the same with respect to any productions made prior to the date of this Order.

If a Party excludes from review a standard, readable, and reviewable file type not within the industry standard, that Party must disclose such exclusion to the other Parties.

### B.    Native Files.

Certain files types, such as presentation-application files (e.g., MS PowerPoint), spreadsheet-application files (e.g., MS Excel, .csv), and multimedia audio/visual files such as voice and video recordings (e.g., .wav, .mpeg, and .avi), shall be produced in Native Format. Presentation files shall be produced in both TIFF and Native Formats and therefore require no slip sheets. For other file types produced in Native Format, the Responding Party shall provide a single-page TIFF slip-sheet with the applicable Bates stamp

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-009361-AMO

indicating that a native item was produced. The corresponding load (.DAT) file shall include a NativeFileLink which provides the relative path linking information for each native file that is produced. In addition, the confidentiality designation will be indicated in the name of the native file where reasonably feasible. The Parties agree that to the extent any Party reasonably seeks production in native format of specifically identified ESI produced originally in TIFF form, the Responding Party shall respond reasonably and in good faith to any such request.

**C.     Parent-Child Relationships.**

Parent-child relationships for all embedded ESI Documents (e.g., the association between an attachment and its parent email, or a spreadsheet embedded within a word processing Document), must be preserved by assigning sequential Bates numbers to all items within the parent-child group, and identifying those Bates numbers in the relevant ESI metadata and coding fields specified in Appendix 2. For example, if a Party is producing an email with embedded attachments, the attachments must be processed and assigned Bates numbers in sequential order, following consecutively behind the parent email.

**D.     Color Documents.**

The Parties may produce in black and white in the first instance, except if it is clear that a document will be illegible if not in color, in which case it should be produced in color. The Parties may request color copies of any documents that cannot be accurately reviewed in black and white TIFF format. Where the Requesting Party reasonably suspects that particular email communications contain color that is necessary to determine the meaning of the communication, the Requesting Party may make reasonable and proportionate requests for particular email communications to be produced in color.  The Parties agree to meet and confer regarding such requests as appropriate. A Party making such a request shall make the request by individual Bates number(s) and shall limit requests made pursuant to this paragraph to a reasonable number of documents. Reasonable requests for color documents should not be refused.

**E.     De-duplication.**

Each Responding Party shall make reasonable efforts to globally deduplicate exact duplicate Documents within that Responding Party's ESI data set across all custodial and noncustodial sources at the family level using either MD5 hash values or SHA hash values.

The Parties shall not withhold from production near-duplicates without meeting and conferring on

- 6 -

this issue.

The names of all custodians who were either identified as custodians for purposes of collection for this matter (or otherwise known by the Responding Party to have been in possession or custody of a document prior to deduplication) will be populated in the ALL CUSTODIANS metadata field for the produced version of a document that has duplicates removed from production. The original file paths (if any exist) of a document prior to deduplication will be populated in the ALL FILE PATHS metadata field of the produced document.

**F.      Metadata Fields and Processing.**

1.      ESI shall be processed in a manner that preserves the source native file and relevant metadata without modification consistent with the requirements provided in this Order.

2.      Hidden text. ESI shall be processed, to the extent practicable, in a manner that preserves hidden columns or rows, hidden text, notes, or worksheets, speaker notes, tracked changes, redlines and comments. Upon request, a Responding Party will produce files with any such information in Native Format.

3.      Compressed Files and Encrypted Files. Compressed file types (i.e., .CAB, .GZ, .TAR .Z, .ZIP) shall be decompressed in a reiterative manner to ensure that a zip within a zip is decompressed into the lowest possible compression resulting in individual files except where those container files are known to contain code or programs. The Responding Party will take reasonable steps, prior to production, to unencrypt any discoverable electronically stored information that exists in encrypted format (e.g., because password-protected) and that can be reasonably unencrypted.

4.      Metadata and Coded Fields. ESI items shall be produced with all of the metadata and coding fields set forth in Appendix 2.

This Order does not create any obligation to create or manually code fields that are not automatically generated by the processing of the ESI, or that do not exist as part of the original metadata of the Document; provided, however, that the Responding Party must populate the (a) BegBates, (b) EndBates, (c) BegAttach, (d) EndAttach, (e) Custodian, (f) NativeFileLink fields, if applicable, (g) TextPath, (h) Redaction status, and (i) Confidentiality designation. These fields should be populated for all documents, regardless of whether the fields can be populated pursuant to an automated process.

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-009361-AMO

## III.    DATABASES, STRUCTURED, AGGREGATED OR APPLICATION DATA

The Parties shall meet and confer regarding the production and format and scope of relevant structured data or aggregated or threaded data source or otherwise maintained by an application (e.g., Microsoft Access, SharePoint, Oracle, Salesforce, ACT!, or any other or proprietary databases or services) in order to ensure that any information produced is reasonably usable by the Requesting Party and that its production does not impose an undue burden on the Responding Party. The Parties will cooperate in the exchange of sufficient information concerning such databases to facilitate discussions on the production of responsive information, including available data fields/objects and schema. To the extent a Party is constrained from producing responsive ESI because of a third-party license or because software necessary to view the ESI is hardware dependent, the Parties shall meet and confer to minimize any expense or burden associated with the production of such documents in an acceptable format, including issues as may arise with respect to obtaining access to any such software and operating manuals.

## IV.    PRODUCTION OF HARD COPY DOCUMENTS

In scanning paper documents, documents are to be produced as they are kept. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-It notes shall be scanned both with and without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-It.  Hard copy documents will be made text searchable. The producing party will use best efforts to unitize documents (*i.e.*, distinct documents should not be merged into a single record, and a single document should not be split into multiple records), and maintain document relationships, i.e., attachment status. Original document orientation (*i.e.*, portrait v. landscape) should be maintained.

## V.    RESPONSIVENESS, PRIVILEGE & REDACTIONS.

### A.    Responsiveness.

The Parties agree that if an attachment to a responsive e-mail is itself wholly nonresponsive to the discovery requests, it will nevertheless be produced along with any other Documents in the family.

### B.    Privilege.

To the extent that a Defendant reasonably determines that e-mail or related attachments that are responsive to Plaintiff's document request are not discoverable because they are subject to a Privilege,

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-009361-AMO

Defendant shall produce a log treating each e-mail and attachment withheld separately.

### C.   Redactions.

Other than as permitted by this Order or the Protective Order entered in this Action, no redactions for relevance may be made within a produced document or ESI item. The Parties agree to meet and confer on a case-by-case basis if a Party believes there is a good faith basis to permit limited redaction by agreement of the Parties of highly sensitive, non-relevant information within a Document that contains other relevant information. Redactions may be made for personal privacy (e.g., social security numbers, HIPAA-protected information, credit card numbers).

Any redactions shall be clearly indicated on the face of the document, with each redacted portion of the document indicating the type of the redaction (e.g., Redacted—Privileged), and a metadata field shall indicate that the document contains redactions. Where a responsive document contains both redacted and non-redacted content, the Parties shall produce the non-redacted portions of the document and OCR text corresponding to the non-redacted portions. The Parties agree that Excel files should be redacted in their native form where possible. Non-Excel ESI items requiring redaction shall be produced in TIFF format. In cases where TIFF format is not practicable, such items should be produced in redacted native format, as outlined below. Any unaffected metadata fields shall be provided. Also, the Responding Party will keep a pristine original copy of the native document.

## APPENDIX 2:  ESI METADATA AND CODING FIELDS

The chart below describes the metadata fields to be produced, where reasonably available, in generic, commonly used terms which the Responding Party is to adapt to the specific types of ESI it is producing, to the extent such metadata fields exist associated with the original electronic Documents and are automatically generated as part of the electronic data discovery process. Any ambiguity about a metadata field should be discussed with the Requesting Party prior to processing the subject ESI for production.

| Field Name | Field Description |
| --- | --- |
| BegBates | First Bates number (production number) of an item |
| EndBates | Last Bates number (production number) of an item<br>**The EndBates field should be populated for single-page items. |
| AttachName | File name of the attachment, with any attachments separated by semi-colon. |
| BegAttach/Group ID | First Bates number of family group. |
| EndAttach | Last Bates number of attachment range (*i.e.*, Bates number of the last page of the last attachment) |
| PgCount | Number of pages in the item |
| Custodian | Name of person or source from whose/which files the item is produced |
| AllCustodian | Name of the person(s), in addition to the Custodian, from whose files the item would have been produced if it had not been de- duplicated |
| FileSize | Size (in kilobytes) of the source native file |
| SourceFilePath | The directory structure or path where the original file was stored on the Party's source computer system, ending in the filename. Any container name (such as ZIP or PST containers) is included in the path. |
| HashValue | The MD5 or SHA-1 or IntMsgID hash value of the item. |
| RecordType | Indicates item type (*e.g.*, email, edoc, attachment) |
| FileType | (*e.g.*, Outlook, Adobe Acrobat, MS Word, etc.) |

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-009361-AMO

| Field Name | Field Description |
|---|---|
| FileExtension | Indicates file extension of the file e.g., .docx, .pptx |
| Parent Date/Sort Date<br><br>Parent DateTime/Sort DateTime | The date associated with a family's parent record, which is assigned as follows:<br><br>Emails populated with 1st occurrence: **Date Sent** or **Date Received** or **Date Last Modified**. Email attachments populated from the date above.<br><br>Outlook Appointments populated with 1st occurrence of **Start Date** or **Date Last Modified**.<br><br>Loose Edocs populated with 1st occurrence of **Date Last Modified** or **Date Created**. |
| DateSent (mm/dd/yyyy)<br><br>DateTimeSent | Date email or calendar item was sent. May be combined into a single field along with TimeSent. |
| TimeSent (hh:mmAM/PM) | Time email or calendar item was sent  (Date and time fields may be combined) |
| DateReceived<br><br>DateTimeReceived | Date email or calendar item was received. May be combined into a single field along with TimeReceived. |
| TimeReceived | Time email or calendar item was received (Date and time fields may be combined) |
| To | The names and/or SMTP email addresses of all recipients that  were included on the "To" line of the email or calendar item |
| From | The name and/or SMTP email address of the sender of the email or calendar item |
| CC | The names and/or SMTP email addresses of all recipients that  were included on the "CC" line of the email or calendar item |
| BCC | The names and/or SMTP email addresses of all recipients that  were included on the "BCC" line of the email or calendar item |
| Importance | High Importance – indicates priority e-mail message |

- 2 -

| Field Name | Field Description |
| --- | --- |
| DateCreated (mm/dd/yyyy) DateTimeCreated | Date the item was created. |
| TimeCreated (hh:mm AM/PM) | Time the item was created (Date and time fields may be combined) |
| ModifiedBy | Person who last modified or saved the item, as populated in the metadata or document properties of the native file |
| LastModDate (mm/dd/yyyy) DateTimeLastModified | Date the item was last modified. |
| LastModTime (hh:mm AM/PM) | Time the item was last modified |
| FileName | The filename of the source native file for an ESI item |
| Title | Any value populated in the Title field of the source file metadata or item properties |
| Subject/E-Mail Subject | Any value populated in the Subject field of the source file metadata or document properties (*e.g.*, subject line of email or calendar item) |
| Author | Creator of the Document; any value populated in the Author field of the source file metadata or document properties |
| Redacted | User-generated field that will indicate redactions. With the word "REDACTED". Otherwise, blank. |
| Confidentiality | User-generated field that will indicate confidentiality. With the word "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" applicable. Otherwise, blank. |
| Production Volume | The Volume name for the production (*e.g.* VOL001). |
| TextPath | Full relative path to the location of the Document-level text file. |
| NativeFileLink | Relative path for Documents provided in Native Format only. \*\*The linked file must be named per the BegBates value. |

- 3 -

| Field Name | Field Description |
|---|---|
| HiddenContent | Denotes if file contains hidden content. Format: Yes/No value. |
| THREADID | ThreadID for email threaded communications |
| Null Set Doc | Yes/No field for documents that get produced and originated in a Null Set, as discussed Sec. VII. |

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-009361-AMO

## APPENDIX 3:  TAR PROTOCOL REQUIREMENTS

a.    General Description and TAR System

    i.    The TAR application or software to be used, including a statement confirming its general acceptance as an industry-standard tool for predictive coding or continuous active learning;

    ii.    The version and any customization of the software.

b.    Selection of the TAR Universe

    i.    The criteria and methodology used to identify the TAR Universe, including any use of date ranges, custodian selection, or other culling criteria prior to the application of TAR;

    ii.    Identification of Document types excluded from the TAR Universe (e.g., images, non-text files, spreadsheets, multimedia, database exports), and the proposed method of their review;

    iii.    Confirmation whether documents subject to manual review were segregated before or after TAR application.

c.    Training of the TAR Model

    i.    The methodology for training the TAR model, including whether training was random, judgmental seed set, stratified sampling, or TAR/Active learning selected;

    ii.    The number of documents used in the training set and a breakdown of responsive vs. non-responsive classifications;

    iii.    Identification of the person(s) responsible for training (e.g., subject matter expert, contract reviewer);

    iv.    Identification of any documents excluded from training and the rationale;

    v.    Description of any quality control performed on the training set prior to model deployment.

d.    Initial Classification and Model Ranking

    i.    The date on which the initial model build was completed;

ii.    Distribution of document scores or rankings from the initial model build, including rank cut-off used (if applicable);

iii.    Number of documents falling above and below the cut-off threshold in the initial model.

e.    Review Methodology and Oversight

i.    Identity and qualifications of reviewers (e.g., SME, contract attorney, paralegal);

ii.    Whether prioritized review, coverage review, or a combination was used, and the sequencing of such methods;

iii.    Number of documents subject to manual review, if applicable;

iv.    Description of quality control/assurance procedures and the personnel conducting them;

v.    Relevance rates observed at various intervals during the review, including initial, interim (if applicable), and final rounds.

f.    Review Completion and Model Iteration

i.    Final document counts above and below the decision threshold;

ii.    Total number of model iterations or updates and changes to document ranking distributions across those updates.

g.    Validation and Elusion Testing

i.    The method of validation used (e.g., system-generated sample or external statistical method);

ii.    Number of validation documents reviewed;

iii.    Confidence Level and Margin of Error used to calculate validation sampling size (with the expectation that parties will use a statistical sampling of a 95% confidence level at 2% margin of error for documents that are excluded beyond the rank threshold for irrelevant documents);

iv.    Final metrics including richness, recall, and elusion rates, with an expectation that elusion shall not exceed 3%.

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-009361-AMO

v.    The TAR Protocol shall be shared with the Requesting Party before application to the document set. The Parties agree to meet and confer in good faith regarding any concerns raised by the Requesting Party, and any unresolved disputes shall be submitted to the Court for resolution.

- 3 -

## APPENDIX 4:  AI PROTOCOL REQUIREMENTS

a. General Description and AI System

    i. The identity, version, and hosting environment of each AI model or system to be used (e.g., LLM, classifier, embedding model; on-premise, private cloud, or vendor-secured environment);

    ii. A statement confirming the system's general acceptance within the eDiscovery industry as a reasonably reliable tool for AI-assisted document review;

b. Selection of the AI Review Universe

    i. The criteria and methodology used to identify the document population subject to AI Responsiveness Review, including any culling performed prior to AI processing (e.g., search terms, date ranges, custodians, deduplication, threading, near-duplicate suppression);

    ii. Identification of any Document types excluded from AI analysis (e.g., images, spreadsheets, unsupported foreign-language Documents, multimedia files, poorly OCR'd Documents, or Documents deemed incompatible with LLM processing), and the method for manually or otherwise reviewing those materials;

    iii. Confirmation whether Documents designated for manual review were segregated before or after application of AI.

c. Training and Prompt Configuration

    i. The methodology used to train or instruct the AI system, including any supervised learning, exemplar-based instruction, embeddings-based classification, transfer learning, prompt-engineering, or hybrid approach;

    ii. The sources of training and validation data, including any SME-curated exemplars, previously reviewed materials, or representative document sets;

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-009361-AMO

iii.   The identity and qualifications of personnel responsible for designing, training, reviewing, or validating the AI workflow (e.g., SME, attorney reviewer, eDiscovery specialist);

iv.   Identification of any Documents excluded from training and the rationale for exclusion (e.g., privileged content, unsupported formats, low OCR quality);

v.   Disclosure of all Prompts, templates, instruction sets, or parameter configurations used to guide any AI component. Any modification to a Prompt after service of the AI Review Protocol shall be disclosed to the Requesting Party in redline form within three (3) business days.

d.   Initial Classification and Scoring

i.   A description of how the AI system generates scores, probabilities, classifications, or decision boundaries, including any thresholds proposed for identifying responsive or non-responsive Documents;

ii.   A distribution of scores or classifications resulting from the initial AI run, including any proposed ranking or score cut-offs;

iii.   Number of Documents initially categorized and the categories applied (e.g., responsive, non-responsive, privileged, uncertain, or requires further review).

e.   Review Methodology and Oversight

i.   The identity and qualifications of the reviewers conducting oversight, privilege review, or validation of AI outputs;

ii.   A description of the review workflow, including whether prioritized review, coverage review, cluster review, prompt-based review, or a hybrid methodology was employed, and the sequencing of such methods;

iii.   The number of Documents subject to manual review, including privilege review and validation sampling;

iv.   A description of all quality assurance and quality control procedures, including:

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-009361-AMO

a)    human confirmation of privilege determinations,

b)    checks for hallucination, over-summarization, or misclassification by the AI system,

c)    testing and verification of prompt performance;

v.    The relevance, precision, and privilege hit rates observed during initial, interim, and final stages of the review.

f.    Model Iteration and Prompt Adjustment

i.    The total number of model iterations, refinements, or prompt adjustments performed during the review;

ii.    A description of changes in classification behavior or score distributions associated with such updates.

g.    Validation and Null-Set Testing

i.    The validation method used (random sampling, system-generated sampling, or external statistical method);

ii.    The number of validation Documents reviewed, calculated using a 95% confidence level with a ±2% margin of error for Documents excluded by the AI as non-responsive;

iii.    Validation results, including richness, recall, precision, and elusion rates for the non-responsive population;

iv.    Elusion Expectation and Corrective Measures.

If validation or null-set testing demonstrates an elusion rate greater than 3%, the Responding Party shall promptly meet and confer with the Requesting Party to determine whether additional training, expanded sampling, recalibration of thresholds, or other corrective measures are necessary. The Parties acknowledge an expectation that elusion shall not exceed 3%.

h.    Logging, Auditability, and Security

i.    All AI processing shall occur within the secure review environment containing the Document collection, and no Document content may be

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-009361-AMO

exported for processing outside that environment except as expressly agreed in writing;

    ii.    The Responding Party shall retain and, upon reasonable request, provide non-privileged audit materials sufficient to explain the operation and performance of the AI workflow, which may include:

        a)    representative training or validation Documents,

        b)    prompt-iteration logs,

        c)    parameter settings or configuration records,

        d)    classification or feature-importance data (if available),

        e)    quality-control and validation logs;

    iii.    To the extent any Prompt or configuration contains proprietary or trade-secret material, such information may be withheld but must be logged with particularity and made available for attorney-eyes-only inspection under the Protective Order.

STIPULATION AND ORDER REGARDING THE PRODUCTION
OF ESI AND HARD COPY DOCUMENTS
CASE NO. 4:25-CV-009361-AMO